IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No.: 4:24-cr-00502-RWS |
| | ) | |
| CYMONE MCCLELLAN, | ) | |
| | ) | |
| Defendant. | ) | |

**SENTENCING MEMORANDUM FOR DEFENDANT CYMONE MCCLELLAN**

Cymone McClellan is a 33-year-old single mother of three young children ( ). Cymone is a daughter. She is an entrepreneur. She is a survivor. And, while she made some criminally poor decisions, this case is an aberration in an otherwise law-abiding life. She appears before this Court with no criminal record. Since her arrest in this case, she has taken extraordinary steps to begin making amends for her crime. For all the reasons set forth herein, she is seeking a community-based sentence of home confinement followed by a period of supervised release.

## I. The nature and circumstances of the offense pursuant to 18 U.S.C. §3553(a)(1).

Without a doubt, the nature of the crime - abusing a food program intended to feed needy children - does not elicit much sympathy; nor does it lend itself to much deconstruction or analysis. Certain facts (like the use of a restaurant named "Elmo's Love Lounge" to prepare some of the meals) make it even harder to

contextualize this facially sensational crime. However, in understanding the "why" of the crime, it is necessary to peel back the layers a bit.

First, this is NOT a circumstance where the crime was a *wholesale* fraud. There is no allegation that the *entire* enterprise Cymone was running (Sisters of Lavender Rose) was a sham or that 100% of the money obtained for the food program was diverted to the defendant. In this case Cymone was in fact running a a functional food program. There were kitchens, there were employees, meals were being made and meals were being provided for needy children. Money from the food program went to buy and prepare meals, to pay employees, to pay administrators, and to carry out the intended goals of her charity. Cymone admits that she diverted money intended for the food program to her own uses (the purchase of a home, a vehicle, her salary, etc.), but it is important in understanding the scope of the crime to know that while a portion was diverted, money did still in fact go to feed children and to run the administrative side of the Sisters of Lavendar Rose.

As it often does, Cymone's participation in the food program started with good intentions, but at some point Cymone took a turn away from the right path.

[REDACTED].[1] Accordingly, Cymone felt she had to move to Illinois (which is the downpayment for the house referenced in P.S.R. ¶20). She later moved again and after a series of long-stay motels and public housing purchased a townhouse (in part using funds from the charity (the Rosetta address)). Her son [REDACTED] was born in [REDACTED] 2021, and Cymone (now effectively a single mother) was suffering post-partum depression. Cymone took a less active role in Sisters of Lavender Rose in early 2021 and was experiencing serious financial strains related to her single income, her separation, and medical expenses related to her daughter (more on that below), and raising the children. It was in this time that the meal padding really took shape – increasing the lunch-served counts to make the business more profitable for Cymone. This is not an excuse for the fraud she committed but is a partial explanation of the motivation which can help the Court to contextualize the crime.

## II. Cymone McClellan's history and characteristics support leniency by the court (18 U.S.C. §3553(a)(1).

Cymone McClellan appears before this Court with a number of personal characteristics and circumstances which warrant the imposition of a non-incarceration-based sentence. The imposition of such a sentence does not in any way minimize the impact this case will have on Ms. McClellan, nor would such a sentence fail to adequately penalize her.

---

1 [REDACTED]

**a. Imprisonment will adversely affect the Defendant's children, especially her minor daughter who has special needs.**

Any period of imprisonment, no matter how brief, will have a severely detrimental effect on Cymone's family, especially her minor daughter [redacted] [redacted]. Cymone is the primary care giver to three children all of whom are under the age of 10: [redacted] [redacted]

While any sentencing can disrupt a family dynamic and will certainly have a negative impact on minor children, this is especially true of Cymone's daughter [redacted] The P.S.R. discusses [redacted] at paragraph 54, but the complexity of the child's condition does not come through in the written record. [redacted] [redacted] [redacted]

(see **Exhibit A**)). See also **Exhibits B** and **C.**

Cymone is the primary caregiver for [redacted] and takes on all these tasks every day. Even when school is in session, Cymone has way more on her plate than the parent of a healthy [redacted], and that is in addition to her two other children (ages [redacted] and [redacted]). [redacted]

There are extremely limited options for placement for Cymone's children in the event of her incarceration (which will of course have the greatest impact on [redacted]). [redacted].[2] Cymone's mother (53-years old) lives in [redacted] and [redacted] which makes her similarly unable to care for children (and Cymone is estranged from her father who is not a candidate to take the children). Cymone's brother is only 22 (and cannot take the kids) and her other siblings are half-siblings and there is not that type of relationship. At this point Cymone is making preemptive requests for placement with her cousins (which would require the

[2] [redacted]

children to be relocated out of state (and require [redacted] [redacted])).

Acknowledging that the Guidelines generally discourages departures premised upon the impact on third-parties[3], *Booker* and *Rita* free courtsto consider these factors as part of their analysis under § 3553(a). In *United States v. Canoy*, the 7th Circuit found the district court erred in refusing to consider a downward departure based on the defendant's extraordinary family circumstances. 38 F.3d 893 (7th Cir. 1994). The district court had refused to depart because the Seventh Circuit's decision in *United States v. Thomas*, 930 F.2d 526 (7th Cir. 1991), prohibited departures based on family circumstances, even in extraordinary cases. *Id.* The circuit court rejected the holding in and followed other circuits' unanimous holdings that §5H1.6 permits departures from a *Thomas* guideline range to account for family circumstances that may be characterized as extraordinary. As highlighted above, a term of imprisonment will have an adverse impact on her family, and a non-incarceration sentence is warranted.[4] The Court should consider some type of community-based sentence for

---

[3] Guidelines § 5H1.6

[4] *U.S. v. Owens*, 145 F.3d 923 (7th Cir. 1998) (departure from 169 to 120 months under § 5H1.6 for defendant who maintained good relationship with his children and court believed his active role raising and supporting his family was atypical for crack dealer and imprisonment may have forced wife on public-assistance and defendant also spent time with brother with Downs Syndrome). See also: *U.S. v. Crawford*, 2007 WL 2436746 (E.D. Wis. Aug. 22, 2007) (District court granted a variance from the Guidelines due to the defendant's family situation with five children and the impact incarceration would have on the children. The Court also considered that the defendant was forced to

Cymone that would allow her to remain the primary caregiver [redacted] [redacted]). This would be an ideal situation for the imposition of a period of home confinement paired with community service, a restitution judgment, to be followed by supervised release.[5] This is a sentence that has a definite restraint on her liberty (in addition to all the other attendant collateral consequences of a felony conviction), but which takes this unique and difficult childcare situation into consideration (allowing for medical and childcare as required). While not minimizing the nature and circumstances of the crime, as a first-time non-violent offender, I think a community-based sentence can be crafted which both accounts for the seriousness of the offense but acknowledges the uniqueness of this defendant.

**b. Cymone**

As the Court can see from the letter of support filed with this memorandum, Cymone enjoys wide support from those in her life. The letters speak of a woman of strong character, who helps those around her, who has a passion for her community and for service.

---

participate in the conspiracy and was severely beaten when she tried to withdraw. Court sentenced her to time served and placed her on four years probation.)

[5] U.S.S.G. §5F1.2 allow home detention as a condition of supervised release as a substitute for imprisonment; U.S.S.G. §5D1.3(b)(3)(L) also allows home detention as a condition of supervised release.

**c. Cymone's acceptance of responsibility has gone above and beyond merely entering a timely plea.**

Unlike some similarly situated Defendants, Cymone has accepted responsibility for her actions, pleaded guilty, and saved the Government and the Courts from a lengthy and expensive trial. Acknowledging this factor is already considered by §3E1.1 of the Guidelines, Cymone has taken additional steps to take responsibility for her crimes and to begin the process of atonement.

Above the beyond the acceptance of responsibility contemplated by U.S.S.G. §3E1.1, [redacted], and has taken immediate steps to begin the process of restitution.

**i.** [redacted]

[redacted]

[redacted].

ii. **Cymone has begun making restitution for her crimes both through assisting the Government with their forfeiture action, and through making regular payments into the registry of the Court. .**

Cymone entered a plea of guilt in this matter on May 27, 2025. (R. Doc. 77). Two weeks later she moved the Court to open an account for restitution, and she immediately began making restitution payments. As of the date of this filing, according to a call with the Office of the Clerk, Cymone has made restitution payments in the amount of $3,400.00, paid into this account.[6]

In addition to the cash restitution payments, Cymone has voluntarily assisted the Government in locating multiple vehicles and property which were subject to forfeiture and has assisted in the surrender of vehicle at the Government's request (a Mercedes Cargo Van). Cymone has made efforts to assist the federal government in seizing property and obtaining restitution.

## III. Considering the appropriate sentence (18 U.S.C. §3553(a)(2)).

All personal context aside, Cymone understands that what she did was wrong. She knows that she committed fraud and she stands ready to be sentenced. As the Court considers the appropriate sentence, there are some factors which should be considered.

[6] See Ref. DMOE424CR000502 /001 (U.S. District Court, Eastern District of Missouri)

**a. The applicable Guidelines.**

The presentence investigation report correctly estimates the total adjusted offense level at 22, which with a criminal history of I (as a zero-point offender) results in a recommended Guidelines range sentence of 41 to 51-months.

**i. In crafting an appropriate sentence, the Court should consider that the fraud Guidelines are disproportionately high.**

In white collar matters, Section 2B1.1(b)(1) dominates the sentencing of financial crimes, assigning large, tiered enhancements based on loss amount. However, to the extent it was supported by empirical data, through the various amendments and adjustments over the years the Guidelines have failed to account for inflation or to remain tethered to a rational relationship with other Guidelines crimes.[7] The impact of inflation on the loss table in §2B1.1 has been the recent subject of the Commissions.[8] Because the loss table has historically been slow to update—with significant gaps between revisions—inflation drives disproportionate sentences for white-collar offenders. Because the dollar amount thresholds in the loss table have not kept pace with inflation, lower-level offenders are increasingly

[7] For a thorough discussion of the amendments to USSG § 2B1.1 and its outsized impacts on fraud Guidelines, see Barry Boss and Kara Kapp, How the Economic Loss Guideline Lost its Way, and How to Save It, 18 Ohio St. J. of Crim. Law 605 (2021).

[8] See *Proposed Amendments Released December 12, 2025.* The proposed amendment reduce the 16-tier loss table to eight broader tiers, aiming to simply sentencing and reduce disputes over marginal loss amounts.

pushed into higher offense levels, leading to disproportionate penalties. There is a need to adjust for the eroding value of money over time to ensure proportionality, fairness, and reduced, more accurate sentencing ranges.

To fully understand the current outsized impact of loss amount, it may be best understood by comparing the Guidelines of Section 2B1.1 to other crimes. Prior to reductions for acceptance of responsibility and being a zero-point offender, Cymone's adjusted offense level was a 27. By way of comparison, an offense level of 27 is associated with felonies which often involve violence or significant drug quantities- below are some examples of federal offenses that reach or sit near this level:

- Assault with Intent to Commit Murder: USSG §2A2.1(a)(2) sets the base offense level at 27 if the object of the offense would not have constituted first-degree murder.
- Robbery (with Firearm Discharge): USSG §2B3.1(a) starts with a base level of 20. If a firearm was discharged, USSG §2B3.1(b)(2)(A) mandates a 7-level increase, totaling 27.
- Drug Trafficking: USSG §2D1.1(c) (the Drug Quantity Table) provides for levels near 27. For example, level 26 applies to offenses involving 5 kg to 15 kg of Marijuana or 500 g to 2 kg of Cocaine.
- Aggravated Assault: USSG §2A2.2(a) starts at level 14. It reaches 27 with enhancements for Firearm Discharge (+5 levels per §2A2.2(b)(2)(A)) and Permanent or Life-Threatening Bodily Injury (+8 levels per §2A2.2(b)(3)(C)).

Common sense dictates that a non-firearm, non-violent, non-drug offense should not be treated as harshly as violent crime. By treating first-time, non-violent offenders convicted of financial crimes with the same severity as repeat, violent offenders, the nature and circumstances of the crime are wildly misstated. Similarly, this apples-to-oranges comparison fails to properly account for the history and characteristics of these two vastly divergent categories of defendants. In one category, you have non-violent offenders at minimal risk of recidivism, with no criminal history; while in the other, you have offenders who have posed—and in all likelihood will continue to pose—a violent threat to society, regardless of prior sentences imposed.

There is a broad judicial consensus that the results of Section 2B1.1 yield sentences that are incongruent with the criminal conduct at issue. See, e.g., *United States v. Corsey*, 723 F.3d 366, 377–78 (2d Cir. 2013) (stating "the loss guideline is fundamentally flawed" and "sentences in high-loss cases will remain wildly divergent as some district judges apply the loss guideline unquestioningly while others essentially ignore it.") (Underhill, J., concurring); see also *United States v. Moody*, No. 1:13-CR-00087, ECF 28 at 9, 2013 U.S. Dist. LEXIS 109506, at *14 (D. Colo. Aug. 5, 2013) (declining to impose a Guideline sentence based in part on the preceding Underhill concurrence in Corsey); *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) ("The Guidelines' calculations for this offense are no longer tied to the mean of what federal judges had previously imposed for such crimes, but instead reflect an ever more draconian approach to white collar crime, unsupported by any empirical data. . . . Was such a crime really 500% worse in 2003

than it was in 1987?"); *United States v. Parris*, 573 F. Supp. 2d 744, 745, 747–48 (E.D.N.Y. 2008) (imposing a sentence of 60 months despite an advisory guidelines range of 360 months to life) (quoting *United States v. Adelson*, 441 F.Supp.2d 506, 515 and 510 (S.D.N.Y. 2006) (noting the Guidelines "have so run amok that they are patently absurd on their face," due to the "kind of 'piling-on' of points for which the guidelines have frequently been criticized.")).

**ii. The Court might consider whether even this range is artificially inflated as it concerns Cymone in particular.**

While the sentencing concepts of "relevant conduct" and "actual versus intended loss" have been explained to the Defendant and she takes full responsibility for the full legal scope of her fraud, it is nonetheless worth noting that the Defendant did not pocket the $2.3M loss amount in this case. While a portion of the fraud was certainly diverted to her personal use (homes, cars, salary) there is no question that Sisters of Lavender Rose did employee people, and did pay salaries, and did purchase food and meals, and did serve meals to children. This is again NOT the type of fraudulent scheme where the charity was created out of whole cloth and every dollar received was criminal lucre.

**b. When considering adequate deterrence, the Court must know that the conviction and its collateral consequences have already provided a serious measure of punishment and deterrence. (18 U.S.C. §3553(a)(2)(B)).**

Section 3553(a)(2) and (3) also require the Court to consider the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law; and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; as well as to consider the kinds of sentences available.

At a minimum, Ms. McClellan has lost many of her civic rights (voting, gun ownership, limitations on foreign travel, job opportunities). She will forever bear the socially stigmatizing mark of a felon as she continues to move through life. Federal law imposes nearly 1,200 collateral consequences for convictions.[9] Convicted felons now suffer restrictions in broad ranging aspects of life that touch upon economic, political, and social rights.[10] Today, the collateral consequences of a felony

---

[9] See Nat'l Inventory of the Collateral Consequences of Conviction, supra note 32 (narrow database search to federal law and then to controlled-substances offenses).

[10] See Nora V. Demleitner, Preventing Internal Exile: The Need for Restrictions on Collateral Sentencing Consequences, 11 Stan L. & Pol'y Rev. 153, 154 (1999); see also Labels Like 'Felon' Are an Unfair Life Sentence, N.Y. Times, at SR 10 (May 8, 2016) (discussing the stigmatizing effect of labels such as "felon," "ex-convict," and "ex-offender").

conviction form a new civil death. *United States v. Nesbeth*, 188 F. Supp. 3d 179, 180 (E.D.N.Y. 2016).[11]

Other courts have found these factors are all appropriate considerations under the punishment considerations of §3553(a)(2). The court in *United States v. Shipley*, noted that the stigma of the crime will follow the Defendant, and that this stigma adds to the punishment being imposed on the Defendant by the Court. 560 F. Supp. 2d 739, 745 (S.D. Iowa 2008). Being deprived of full participation in civic life due to this conviction, both through legal loss of privileges and the social stigma attached to the offense, is an additional substantial punishment that hits an individual with the background of the Defendant especially hard. *Id.* The inability to vote or serve on a jury are further reminders of the Defendant's crime that will haunt her for the rest of her life. *Id.*

**c. Cymone is unlikely to reoffend, so the public is in no danger of future criminality (18 U.S.C. §3553(a)(2)(C))**

Cymone McClellan has no prior criminal history and a very low statistical risk of recidivism.

Cymone is a 33-year old black female with no prior felony convictions. She has a high school degree and some college education. Cymone has been employed

---

[11] *United States v. Nesbeth*, 188 F. Supp. 3d 179 (E.D.N.Y. 2016) contains an in-depth analysis of the history and scope of collateral consequences of a federal felony conviction.

throughout her adult life, she has been married, and she has no history of drug or alcohol abuse.

For all female offenders in Criminal History Category I, the recidivism rate is only 10%. With respect to defendants in Criminal History Category I: for those over 31 to 35 (like Cymone) the rate of recidivism is only 14.6%; for those who have been employed, the rate is 12.7%; for those with some college the rate is 10.9%; and for those who were ever married, the rate is 9.8%; or those with no history of illicit drug use, the recidivism rate is half that of those who do have a drug history. See U.S. Sent'g Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at Exh. 9, at 28; Exh. 10, at 29 (May 2004). Undoubtedly, for those like Cymone who have no criminal history, who are educated, who have been employed, who have been married and who are drug free, the combined rate is even lower.

For all Category I defendants convicted of fraud, the recidivism rate is just 9.3%, the lowest of any offense category, which is 45% below the rate for all fraud offenders. Id., Exh. 11, at 30. Finally, offenders like Cymone with zero criminal history points have a rate of recidivism half that of offenders with one criminal history point. See Sent'g Comm'n, Recidivism and the "First Offender," at 13-14 (May 2004).

In imposing the least severe sentence to account for the need to protect the public from further crimes of Cymone McClellan, this Court should consider the statistically low risk of recidivism presented by her history and characteristics. See,

e.g., *United States v. Darway*, 255 Fed. Appx. 68, 73 (6th Cir. 2007) (upholding downward variance on basis of defendant's first-offender status); *United States v. Urbina*, slip op., 2009 WL 565485, *3 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties); *United States v. Cabrera*, 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (granting variance because defendants "with zero criminal history points are less likely to recidivate than all other offenders").

## IV. Considering the kinds of sentences available, a community sentence is a recommended alternative to incarceration. (18 U.S.C. §§3553(a)(3)).

A 2005 report issued by U.S. Probation and Pretrial Services encourages the use of community service sentences as "a flexible, personalized, and humane sanction, a way for the offender to repay or restore the community. It is practical, cost-effective, and fair, a 'win-win' proposition for everyone involved." *See* Probation and Pretrial Services Division of the Administrative Offices of U.S. Courts, *Community Service Sentences* (2005). According to the report, "community service addresses the traditional sentencing goals of punishment, reparation, restitution, and rehabilitation…It restricts offenders' personal liberty…allows offenders to atone or 'make the victim whole' in a constructive way [and] may be regarded as…a form of symbolic restitution when the community is the victim." *Id.* Further, "Courts can use community service successfully with a wide spectrum of offenders: corporation and individuals, first offenders and recidivists, the indigent and the affluent, juveniles and senior citizens." *Id.*

Outside of this case, Cymone has no criminal history. She was employed full time, has a stable family base, has no history of violence, and poses no danger to the community. A sentence of home confinement, with a condition of community service, followed by supervised release is sufficient but not greater than necessary to achieve the sentencing objectives of §3553(a).

- **Alternatively, a minimum prison sentence will be sufficient.**

Cymone McClellan has never been imprisoned for any period before and therefore any term of imprisonment, however short, will have a significant deterrent effect (see §3553(a)(2).

Generally, a lesser prison term is sufficient to deter one who has not been subject to prior lengthy incarceration. *U.S. v. Qualls*, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005).[12] Any period of incarceration for Ms. McClellan will have a

---

[12] See: *U.S. v. Baker*, 445 F.3d 987 (7th Cir. 2006) (affirming non-guideline sentence of 78 months from 108 months for defendant convicted of distributing child porn, justified in part by judge's finding that prison would mean more to this defendant than one who has been imprisoned before, which resonated with goal of "just punishment" in § 3553(a)(2)(A) and "adequate deterrence" in Section 3553(a)(2)(B); see also *U.S. v. Paul*, 239 F.App'x 353 (9th Cir. 2007) (defendant's 16-month sentence, the top end of the guideline range for unlawful receipt of federal funding, was unreasonably high because defendant was a first-time offender, returned the funds, and displayed remorse); *U.S. v. Jewell*, 2009 WL 1010877 (E.D.Ark. April 15, 2009) (defendant sentenced to 30 months in prison for aiding and abetting tax evasion, because guideline range near the statutory maximum of 5 years was inappropriate for first time offender); *U.S. v. Cull*, 446 F. Supp. 2d 961 (E.D. Wis. 2006) (non-guideline sentence of 2 months in jail and 4 months home confinement, where

disproportionately greater deterrent effect on her than on someone who has experienced a substantial prison sentence on more than one occasion. See *United State v. Serrano*, 2005 WL 1214314 at *8 (S.D.N.Y. May 19, 2005) (unpublished) (because defendant had never spent more than a year incarcerated, despite minor drug convictions, any term greater than one year would achieve deterrent effect of career offender designation).

WHEREFORE, Defendant Cymone McClellan respectfully requests that the District Court:

a. Impose a community-based sentence of home-arrest, (with conditions of community service) to be followed by 2-years of supervised released; or
b. In the alternative, impose a minimal sentence of incarceration, to be followed by 2 - years of supervised release;
    a. To the extent the Court orders a sentence of incarceration, make a recommendation to the United States Bureau of Prisons that the Defendant be evaluated for participation in any educational or vocational programs available.

And for such further relief as the Court may deem just and proper in the premises.

---

advisory range was 10-14 months for marijuana offense by defendant who had never been confined, was sufficient to impress on him the seriousness of his crime and deter him from re-offending).

Respectfully submitted,

**NEWTON BARTH, L.L.P.**

By: */s/ Talmage E. Newton IV*
Talmage E. Newton IV, MO56647
talmage@newtonbarth.com
555 Washington Ave., Suite 420
St. Louis, Missouri 63101
(314) 272-4490 – Telephone
(314) 762-6710 – Facsimile

*Attorney for Defendant McClellan*

## APPENDIX OF RELEVANT DOCUMENTS

| Exhibit | Description |
|---|---|
| A | [redacted] |
| B | [redacted] |
| C | [redacted] |
| D | Jaylia Washington |
| E | Bishop Shandrach Martin |
| F | Margraretha Wells |
| G | Tanasha Stayton |
| H | Brittany Wayne |
| I | Kisha Harris |

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that a copy of the foregoing was electronically served on all parties of record via the court's e-filing system on this 1st day of April 2026.

*/s/ T. E. Newton IV*